[Civ. No. 6575.   Third Dist.—June 10, 1941.]

ROY O. WILCOX, Respondent, v. SADIE WEST et al., Appellants.

Newby & Newby, Dee Holder and Preisker, Goble, Twitchell & Stephan for Appellants.

Heaney, Price, Postel & Parma, Clarence A. Rogers and Charles F. Johnson for Respondent.

SCHOTTKY, J., *pro tem.*—Appellants appeal from a judgment which decrees that they have no right or title in certain real property, but that respondent is the owner and entitled to the possession thereof. The amended complaint alleges ownership on the part of plaintiff, alleging that the defendants claim some interest therein, which claim was without right. Certain defendants defaulted, and others filed disclaimers, and the remaining appellants filed answers, in which they denied that they had no interest in said property, and also set up the affirmative defense that they had an interest under a certain oil and gas lease executed by respondent, which lease they alleged was still in full force and effect. There was no controversy as to the ownership of the land by plaintiff or as to the execution of the lease and the various assignments and sub-leases, and the sole issue upon the trial was as to whether or not the rights of the defendants under the lease had been terminated.

The trial court found that the respondent was the owner in fee of the premises involved, and entitled to the possession thereof; that none of the appellants had any right, title or interest in or to the property, and a decree in accordance with such findings was entered. The trial court made no specific findings as to the issues raised by the affirmative defenses set up on the answers. A motion for a new trial was subsequently made and denied.

On May 25, 1937, respondent, the plaintiff herein and the owner of four acres of land near Santa Maria, in Santa Barbara County, entered into an oil and gas lease affecting said land, with appellant, Sadie West. Thereafter, on September 9, 1937, appellant Sadie West assigned a one-half

interest in such lease to appellant Charles T. McDermont, and on the same day, appellants West and McDermont entered into a sub-lease of said property with appellant Clyde E. Greathouse as sub-lessee. On September 9, 1937, appellant Clyde E. Greathouse assigned said sub-lease to appellant A. M. Johnson, and on September 23, 1937, appellant A. M. Johnson assigned said sub-lease to appellant E. B. Kenney. On November 8, 1937, appellant E. B. Kenney paid the sum of $150 as rental under the terms of the lease and sub-lease, $75 being paid to respondent, and $75 to appellants West and McDermont, sub-lessors. On December 7, 1937, and again on January 8, 1938, like payments were made by appellant Kenney, but no further payments were made thereafter.

On January 24, 1938, appellant Kenney took physical possession of the property, and did certain acts hereinafter referred to, between that date and February 7, 1938. Appellant Kenney testified that inclement weather prevented him from bringing additional machinery and materials from his property in Los Angeles County; that he had at all times been ready, able and willing to go ahead with the development of the property; that he had expended the sum of $7,775.42 in connection with the lease and the development of the property; that he was never served with any notice of default; and that the filing of the action to quiet title "stuck his work on the lease". Respondent, who was the only other witness, testified that it rained between February 8th and February 25th, but that the rain was not sufficiently heavy to prevent a truck from entering and leaving the property, nor to prevent work on adjoining property. It was admitted that no notice of default was served on any of appellants and that the action to quiet title was filed on March 11, 1938.

A proper understanding of the issues involved requires the quoting of pertinent portions of the lease, which are as follows:

"4. This lease shall terminate as to all rights and obligations contained hereunder unless the lessee shall on or before one year from date hereof commence operations for drilling of a well for oil or gas on the above described land, and prosecute the drilling thereof with due diligence and .dispatch until a depth of 5000 feet has been reached.

5. If operations for the drilling of a well for oil or gas be not commenced on said land on or before six months from this date, this lease shall terminate as to both parties, unless the lessee shall, on or before six months from this date, pay or tender to the lessor or for lessor's credit in the Bank of America at Santa Maria, California, . . . the sum of Eighteen and Seventy-five one hundredths ($18.75) dollars per acre per month, which shall operate as rental and cover the privilege of deferring the commencement of drilling operations for a period of one month. In like manner and upon like payments or tenders, the commencement of drilling operations may be further deferred for like periods successively during the term fixed in the preceding paragraph for the commencement of drilling operations.

18. Upon the violation of any of the terms or conditions of this lease by the lessee and the failure to remedy the same within sixty days after written notice from the lessor so to do, then, at the option of the lessor, this lease shall forthwith cease and terminate, and all rights of the lessee in and to said land be at an end.

23. 'Drilling Operations', as used in this lease, is defined to mean placing of material upon premises for the construction of a derrick and other necessary structures for the drilling of an oil or gas well followed diligently by the construction of such derrick and other structures and by the actual operation of drilling in the ground.''

The lease here involved is what is generally known as the ''unless'' lease, and results in an automatic termination of the lease if the lessee fails to commence operations within the time limited, and fails to pay delay rentals in advance.

In Summers' Work on Oil and Gas, it is stated at page 351:

''In an Oil and Gas Lease, where the unless clause is used, and the lease expressly provides that, if a well is not completed by a certain date, the lease shall be null and void unless the lessee pays a certain sum in advance for the extension of his privilege to explore the land, there seems to be no question but that the lessee, to save the lease from termination, must pay the stipulated sum at the beginning of the rental period. And the same result follows if the lease instead of expressly providing that the lessee pay in advance provides that if the lessee does not drill by a certain

date the lease will be null and void unless the lessee pays a stipulated sum on or before that date.''

In ''Oil and Gas Leases and Royalties'', by Glassmire, at page 175, the same rule is expressed in somewhat more detail. The rule as stated in the foregoing citations is supported by the following California cases: *Taylor* v. *Hamilton,* 194 Cal. 768, 776 [230 Pac. 656]; *Johnston* v. *Courtial,* 216 Cal. 506 [14 Pac. (2d) 771]; *Andrews* v. *Russell,* 85 Cal. App. 149 [259 Pac. 113].

Appellants contend that drilling operations were commenced, and that the lease thereupon became effective, and that the only way in which the lease could thereafter be terminated was under the provisions of paragraph 18 thereof, by a written notice to appellants. Appellants concede that if they failed to commence drilling operations or to pay the rental required under the provisions of the lease, then the lease was terminated by the force of its own provisions and without notice to appellants. Respondent, however, contends that the appellants did not commence drilling operations under the lease, and not having made any payment after January 8th, the lease automatically terminated under paragraph 5 thereof. Respondent asserts that prior to February 8, 1938, all material was on the ground, and after that date, nothing whatever was done toward drilling the property, and by virtue of the lien, all rights of defendants terminated *ipso facto* on midnight of February 25, 1938, by their failure to pay the delay rental or to commence drilling operations.

As we view paragraph 23, defining ''Drilling Operations'', it is intended to define what completed operations consist of, and certainly there must be a distinction in law and in fact between the commencement of operations and the completion thereof. The word ''commence'' is defined in 11 Corpus Juris, at page 1237, as follows:

''Commence. To cause to begin to be; perform the first act of; enter upon; begin; to originate; to do the first act in anything; to take the first step; to start.''

The rule which seems to be supported by the great weight of authority is stated in Summers on Oil and Gas, at page 362, as follows:

''#113. What constitutes the beginning or commencement of a well or drilling operations.

Where the lessee covenants to begin or commence a well or drilling operations within a certain definite time, and his failure to do so places him under a liability to have the lease forfeited, or a duty to pay delay rental, it becomes necessary to determine what act or acts of the lessee will satisfy this requirement. The general rule seems to be that actual drilling is unnecessary, but that the location of wells, hauling lumber on the premises, erection of derricks, providing a water supply, moving machinery on the premises and similar acts preliminary to the beginning of the actual work of drilling, when performed with the *bona fide* intention to proceed thereafter with diligence toward the completion of the well, constitute a commencement or beginning of a well or drilling operations within the meaning of this clause of the lease.''

No case has been called to our attention which goes beyond the text just quoted. We are therefore called upon to decide whether the acts of appellant Kenney in connection with the lease in question constituted the ''commencement of operations for the drilling of a well''. The evidence is uncontradicted that appellant Kenney took physical possession of the property on January 14, 1938; that he posted notices on the property forbidding trespassing; that he moved some lumber on the property; that he ordered roads built and a sump-hold made; that he secured a permit from the State Mining Department to drill an oil and gas well upon the property; that on the 17th of January the road and the sump-hold were completed and he started to move derrick timbers from his property in Huntington Beach, and such timbers were placed on the property on January 23d; that on January 19th he obtained a driller's bond from the county of Santa Barbara, and on the same day obtained a driller's bond in the sum of $5,000 from the State of California; that on January 22d he obtained a license from Santa Barbara County to drill the well; that on February 7th the work was started on the forms for the concrete foundation for the derrick, and that this work was completed on February 8th; that no further work was done on the premises. Appellant Kenney testified, as set forth above, that inclement weather prevented him from bringing additional machinery and materials from the Los Angeles Basin. Respondent, who was the other witness, testified that it rained between February 8th and 25th, but that the rain was not sufficiently heavy to prevent trucks from

entering and leaving the property, nor to prevent work on adjoining properties.

A reading of the record convinces us that it must be held that appellants did "commence operations for the drilling of a well" unless it must also be held that all of the work and preparation by appellant Kenney was not performed with the *bona fide* intention to proceed thereafter with diligence toward the completion of a well. In other words, appellant Kenney must have been acting in "bad faith", and a finding of bad faith would be tantamount to a finding of fraud.

As we have heretofore pointed out, the only findings made by the trial court were that respondent was the owner in fee of the property involved, and that none of the appellants had any interest therein. There was no specific finding that appellant Kenney was acting in bad faith, and even if it could be held that there was an implied finding of bad faith, we do not believe that such a finding would be supported by the record in this case. For, as was said by our Supreme Court in case of *Ryder* v. *Bamberger*, 172 Cal. 791, 799 [158 Pac. 753] :

"If there be two inferences, equally reasonable and equally susceptible of being drawn from the proved facts, the one favoring fair dealing and the other favoring corrupt practice, it is the express duty of court or jury to draw the inference favorable to fair dealing." (Citing authorities.) "For fraud must always be proved, so that when the plaintiff's case goes no further than to establish a state of facts from which the inference of fraud may or may not be reasonably drawn, he has failed to establish his charge by a preponderance of the evidence, and it becomes the duty of the court or jury, as has been said, to find in favor of innocence and uprightness."

We are convinced, therefore, that appellant did "commence operations for the drilling of a well", and that consequently there was no automatic termination of the lease. If respondent felt that appellant Kenney was not proceeding as diligently as he should, then respondent had the right under paragraph 18 of the lease to terminate the rights of appellants by giving sixty days written notice.

We believe the instant case is strikingly similar to the case of *Scheel* v. *Harr,* 27 Cal. App. (2d) 345 [80 Pac. (2d) 1035]. In that case the lease provided:

" 'This lease shall terminate as to all rights and obligations contained hereunder, unless the lessee shall, on or before November 1st, 1936, commence the actual drilling and spudding in of a well for oil or gas on the above described land, and prosecute the drilling thereof with due diligence and dispatch until a depth of 5000 feet has been reached. . . . ' "

The lease in the case just cited also contained the identical paragraph 18 that is contained in the lease in the instant case. The well was "spudded in" prior to the required date, the well drilled twenty-six feet, and then most of the machinery had been removed and drilling ceased. The plaintiffs then commenced an action to quiet title without first giving a written notice of default. The trial court rendered judgment quieting title against the lessee, and the judgment was reversed on appeal.

The similarity between the Scheel case and the instant case is indeed striking. In the Scheel case the lease terminated "unless" the well was spudded. The well was spudded in, but nothing else was done. In the instant case the lease terminated "unless drilling operations were commenced", and the lessee commenced operations for drilling the well. We can best illustrate the similarity between the two cases by quoting from the opinion in the Scheel case, commencing at page 348:

"The only question before us is whether or not respondents were required, as a prerequisite to commencing this action to quiet title, to give to appellant as the holder of the lease a notice under the above-quoted provisions of paragraph 18 thereafter to perform its terms, and thereupon, before proceeding further, to allow it sixty days in which to do so. On appellant's part the claim is that the lease had gone into effect, and any failure on appellant's part in its performance would amount at the most to a condition subsequent and terminate it only in the circumstances contemplated by the said paragraph 18, that is, the failure to perform within sixty days after notice of default given. Respondents take the position that appellant, never having in good faith commenced operations as required, a condition precedent to the

effectiveness of the lease failed of performance; that in any event the above-quoted language of paragraph 4 provides for the termination of the lease *ipso facto* upon noncompliance with an essential condition, whereas the provisions of paragraph 18 above referred to provide merely for an optional forfeiture for breach of subordinate covenants; that the more specific provisions of paragraph 4 control the more general provisions of paragraph 18; that appellant's default of itself terminated whatever rights appellant might have had under the lease; and that it was competent to begin and prosecute the present action without the service of any notice; in addition to which it is claimed that appellant has effectually abandoned the leased premises and for that further reason can assert no rights under the lease.

"We are unable to agree that the above-quoted language from paragraph 4 of the lease creates any condition precedent to its becoming effectual. No condition precedent is there expressed. What the paragraph does say is that the lessees' failure to comply with its requirements shall 'terminate' the lease. That is language appropriate not to a condition precedent but to a condition subsequent. Neither can we agree that the language quoted from paragraph 4 controls that quoted from paragraph 18. It seems to us that the contrary is true. So far as the actual 'spudding in' of the well was concerned, there is no question that it was done within the time which the lease contemplated. . . . The further requirements of paragraph 4 were that the lessee should prosecute the drilling with due diligence and dispatch until a depth of 5000 feet should have been reached, etc., and it is that which was not done. This was not something that had, under the terms of the lease, to be done on or before any particular date. It was something that, in any circumstances, would require some time. In view of the necessity of reading paragraphs 4 and 18 together, and of the unqualified language of section 18, as respects its requirement of the 60-day notice to perform, to be given to the lessees in the event of their default, as a prerequisite to the termination of the latter's rights, we think that at least after drilling had once commenced, the well been 'spudded in', and thereby the only condition subsequent tied to any stated date had ceased to figure in the case, the provisions of Section 4 having to do with the termination of the lease if the work were not

diligently prosecuted, were as much subject to the requirement of the 60-day notice to perform as any other terms or conditions contained in the instrument. . . . It may then, for the purposes of this decision be assumed that the court's finding that appellant's operations were not in good faith is tantamount to a finding both that the appellant was guilty of fraud, and further that the consideration running to respondent for the lease, has, by reason of appellant's breach, failed. But even though all this be true, it does not seem to us to dispense with the requirement of paragraph 18 that the 60-day notice be given as a prerequisite to making effective the termination of the lessees' rights. An instrument procured by fraud is not a void instrument; neither does the failure of consideration render a transaction a nullity from the beginning. Fraud, if perpetrated in its inception is a ground for rescinding a contract and the failure of consideration is a ground for either rescinding or terminating a contract, according to circumstances, but until rescinded or terminated a contract once in effect remains in effect. In the instant case there has been no attempt to rescind and respondent has chosen not to follow the method of effectuating a termination prescribed by the language quoted from paragraph 18.''

Appellant makes the further point that the trial court erred in failing to find upon all material issues of the case. They point out that the appellants set up in their respective answers a claim to an interest in the property under the original lease and under a sub-lease, and that appellant Kenney alleged in his answer that he fully performed the terms of the lease. The trial court merely found that respondent was the owner and entitled to the possession of the property, and none of appellants had any interest therein, but made no specific findings as to the affirmative defenses set up in the answers.

Under the system of express findings provided for by the Code of Civil Procedure (secs. 632, 633), full findings. unless waived, are required on all material issues raised by the pleadings. This applies not only to issues raised by denials of the allegations of the complaint, but to issues raised upon affirmative defenses set up in the answer. A failure to make a finding on a material issue ordinarily results in prejudicial error entitling the complaining party

to a reversal, provided it appears that there was evidence introduced as to such issue, and that it was sufficient to sustain a finding in favor of such party. (See 24 Cal. Jur., p. 935, sec. 183.)

In the case of *Hudson* v. *Becker,* 12 Cal. App. (2d) 743 [56 Pac. (2d) 249], a case cited and apparently relied upon by both respondent and appellants, it is said, at page 747:

"With regard to the plaintiffs' contention that the judgment must be reversed because the trial court failed to find specifically that the bank had waived the default and because such finding, if made, must have been in favor of the plaintiffs, there are two answers: First, we have already said that there was substantial evidence that the default had not been waived; second, there was no allegation in the pleadings that the bank had waived the default and there was no issue in the pleadings with regard to the matter. The plaintiffs' complaint was the ordinary action to quiet title. The defendants set up an affirmative defense that they were the owners of the property. The issue as to waiver of the default arose merely in the evidence at the trial. Ordinarily, the findings of fact are sufficient if they follow the language of the pleadings. (*Dam* v. *Zink,* 112 Cal. 91 [44 Pac. 331]; *Vasey* v. *Campbell,* 4 Cal. App. 451 [88 Pac. 509]; *Biurrun* v. *Elizalde,* 75 Cal. App. 44 [242 Pac. 109]; also, see cases collected in 24 Cal. Jur. 984.) Ownership of the property by the defendants was the ultimate fact which was alleged in the answer and which was set forth in the findings. (*Hitchcock* v. *Rooney,* 171 Cal. 285 [152 Pac. 913]; *Hannah* v. *Canty,* 175 Cal. 763 [167 Pac. 373].) Plaintiff should remember that in reviewing the sufficiency of the findings to support a judgment, regard will be had to the ultimate facts and not to mere probative facts. (2 Cal. Jur. 872, and cases cited in Ten-Year Supp.)" (See, also, *Caswell* v. *Gardner,* 12 Cal. App. (2d) 597 [55 Pac. (2d) 1222], and *Richter* v. *Adams,* 19 Cal. App. (2d) 572 [66 Pac. (2d) 226].)

Applying these authorities to the instant case we conclude that the trial court erred in not finding specifically as to the affirmative allegations of the answers, and particularly as to the affirmative allegations in the answer of appellant Kenney. However, under the circumstances this omission to find upon the affirmative allegations of the answer is not as

important as were the other issues presented which require a reversal of the judgment. It is so ordered.

Thompson, J., and Pullen, P. J., concurred.