[Civ. No. 252. Fifth Dist. Aug. 30, 1963.]

MONTANA-FRESNO OIL COMPANY, Plaintiff and Respondent, v. JEAN MARVIN POWELL, Defendant and Appellant.

*Assigned by Chairman of Judicial Council.

656

Vizzard, Baker, Sullivan & McFarland and Jere N. Sullivan for Defendant and Appellant.

Julian P. Beek and Miles, Sears & Franson for Plaintiff and Respondent.

CONLEY, P. J.—Jean Marvin Powell appeals from a decree quieting plaintiff's title to 120 acres of oil land in the Kern River Field as against an oil and gas lease originally executed in her favor by plaintiff. Of a total of 52 defendants, Mrs. Powell is the only one who has not disclaimed, defaulted or failed to appeal; she will be referred to herein as the defendant.

The principal questions to be determined are the meaning of the *habendum* clause of the oil lease itself, and whether under the evidence the lease terminated as found by the trial court. Additional claims of estoppel, waiver, laches and unjust enrichment will be considered, as well as the further contentions of appellant that even if the term of the lease ended as claimed by respondent, she nevertheless is a tenant from month to month, or, alternatively, is entitled to operate an area of 10 acres surrounding each ''well producing or being drilled.''

Plaintiff corporation became the owner of the 120-acre parcel in 1901. The defendant submitted to plaintiff a printed form of oil lease (Oil Age Form of the Petroleum World) with some blanks filled in and several deletions and riders; it was signed on July 16, 1945. Previously, seven wells had been drilled, three of which had been abandoned; the remaining four wells were numbered 1, 2, 3 and 4. Number 2 well never thereafter produced. The lease recites a consideration of $10 and other consideration; another lease was assigned at that time by the defendant to plaintiff. No substance other than oil was ever produced on the land. At the end of the primary two-year period, the lease was concededly in effect. Thereafter, defendant, or those claiming rights in sequence under her, drilled wells 5, 6, 7 and 8 and produced some oil up to the time of the commencement of suit on October 2,

1959, with the exception of five separate periods of total cessation of production: six months, from April to September 1948; 19 months, from August 1949 to February 1951; eight months, from August 1951 to March 1952; 18 months, from July 1952 to December 1953; and five months, from April 1959 to August 1959.

On December 15, 1951, defendant executed a document in favor of R. Monterastelli, denominated an assignment therein but which counsel for the appellant contend was in fact a sublease. By the terms of this instrument defendant reserved an override of 4½ per cent, provided a right of reentry for condition broken, and by contractual provisions obtained a monthly payment irrespective of production. The legal effect of this writing will be further commented on at a later point in the opinion. Monterastelli was succeeded in turn by several assignees or sublessees who produced oil on the premises.

 This suit was commenced without service of any notice of default or notice of termination. If, as defendant contends, the *habendum* clause in the original lease created title in fee on condition subsequent rather than a determinable fee, the defendant would have been entitled to a notice of termination, and the judgment concededly would have to be reversed. If, on the other hand, as plaintiff claims, the *habendum* clause created a determinable fee and the defendant's interest ceased upon the first or a later period of total cessation of production, then no notice would be required, and the principal question on the appeal would necessarily be decided in respondent's favor.

The lease provides in part as follows:

"OIL AND GAS LEASE

"THIS AGREEMENT, made and entered into this 16th day of July, 1945, by and between MONTANA-FRESNO OIL COMPANY, a corporation, party of the first part, herein styled 'Lessor,' and L. JEAN MARVIN [POWELL], party of the second part, herein styled 'Lessee.'

"WITNESSETH: That for and in consideration of Ten (10.00) Dollars lawful money of the United States of America, to the Lessor paid, and of other valuable considerations, the receipt of all of which is hereby acknowledged, and in consideration of the covenants and agreements hereinafter contained by the Lessee to be kept and performed, the Lessor has granted, leased, let and demised, and by these presents does grant, lease, let and demise unto the Lessee, its grantees, successors and assigns, the land and premises hereinafter de-

scribed with the sole and exclusive right to the lessee to drill for, produce, extract, take and remove oil, gas, asphaltum and other hydrocarbons (and water without cost for its operations) from, and to store the same upon, said land during the term hereinafter provided, with the right of entry thereon at all times for said purposes, and to construct, use, maintain, erect, repair and replace thereon and to remove therefrom all pipe lines, telephone and telegraph lines, tanks, machinery, buildings and other structures which the lessee may desire in carrying on its business and operations on said land, or adjoining or neighboring premises operated by Lessee, with the further right to the Lessee or any of its subsidiaries to erect, maintain, operate and remove a plant with all necessary appurtenances, for the extraction of gasoline from gas produced from said land and/or other premises in the vicinity of said land, including all rights necessary or convenient thereto, together with rights-of-way for passage over, upon and across, and ingress and egress to and from, said land, for any or all of the above mentioned purposes. The possession by the Lessee of said land shall be sole and exclusive, excepting only that the Lessor reserves the right to occupy said land or to lease the same for agricultural, horticultural, or grazing uses, which uses shall be carried on subject to, and with no interference with the rights or operations of the Lessee hereunder. The land which is the subject of this lease is situated in the County of Kern, State of California, and is described as follows, to-wit:

"South half of Southeast quarter and Northeast quarter of Southeast quarter of Section 13, Township 28 S., Range 27 E., M.D.B.&M.

"and contains 120 acres, more or less.

"To Have And To Hold the same for a term of Two (2) years from and after the date hereof and so long thereafter as oil or gas, or casinghead gas, or other hydrocarbon substances, or either or any of them, is produced therefrom."

The *habendum* clause is immediately followed by the statement: "In consideration of the premises it is hereby mutually agreed as follows:" with some 30 numbered paragraphs in sequence thereafter, including:

"21. Upon the violation of any of the terms or conditions of this lease by the lessee and the failure to begin to remedy the same within 90 days after written notice from the Lessor so to do, then, at the option of the Lessor, this lease shall forthwith cease and terminate, and all rights of the Lessee in

and to said land be at an end, save and excepting ten (10) acres surrounding each well producing or being drilled and in respect to which Lessee shall not be in default, and saving and excepting rights-of-way necessary for Lessee's operations, provided, however, that the Lessee may at any time after such default, and upon payment of the sum of TEN (10) DOLLARS to the Lessor as and for fixed and liquidated damages quitclaim to the Lessor all of the right, title and interest of Lessee in and to the leased lands in respect to which it has made default, and thereupon all rights and obligations of the parties hereto one to the other shall thereupon cease and terminate as to the premises quitclaimed.''

■ An operating oil lease is both a conveyance and a contract designed to fit the needs of the owner of the land and the operator of the oil properties in making them productive. As such, it contains traditional conveyancing portions and particularly phrased contractual portions. The lease, upon analysis, is divided into three distinct parts, which illustrate the usual separate conveyancing and contractual elements: (1) the granting clause which is a conveyance of the fee simple in the *profit à prendre*; (2) The *habendum* (and *tenendum*) clause which limits the fee simple by the determinable event; (3) The contractual provisions numbered 1 to 30, which contain detailed specifications for the operation of the oil wells.

■ Under the usual oil lease, the owner-lessor transfers to his lessee the right to drill for and produce oil and other similar substances, in return for which he receives a rental share or royalty. In effect it is a sale and conveyance of a part of the land; the nature of the lessee's interest is a *profit à prendre*, either for a term of years or indefinitely. ■ A determination of the term of the lease requires a consideration of all of its provisions, but in the absence of later specific wording which would compel a different conclusion, the *habendum* clause controls the period for which the lease is to run. An oil lease may provide for a primary term and for continuance for so long thereafter as the lessee conducts drilling or producing operations. The language providing for a continuance of the lease after the definite stated term is often designated as a ''thereafter'' clause. The main purpose of an oil or gas lease is to secure production of oil and gas in paying quantities.

In the leading case of *Dabney* v. *Edwards*, 5 Cal.2d 1 [53 P.2d 962, 103 A.L.R. 822], the Supreme Court said that an

oil lease which provides for a definite term of years is not included within the concept of "real estate," but is a chattel, as at common law; however, an oil lease containing a "thereafter" provision in its *habendum* clause is a freehold estate in the nature of a determinable fee. (P. 12.) At page 14 of the opinion the Supreme Court said:

"Obviously the lease is divided as to duration into two parts, the definite term, commonly called the exploratory period, and the indefinite term, beyond the exploratory period, for which the lease may be extended by production. The 'thereafter' clause prescribes the condition of fact which must exist within or at the end of the exploratory period of the lease upon which the lease may be continued beyond the definite term, as well as the conditions which must exist after the end of the exploratory period, upon which the lease may continue indefinitely. In other words, during the definite fixed term, the lessee must complete its exploratory work (except in very exceptional cases when for some equitable reason the definite term may be extended) and having discovered and produced oil upon the leased premises within the definite fixed term must continue such production during the remainder of the fixed term in order to be entitled to continue the lease thereafter, *and may continue as lessee thereafter only so long as production is continued.* It is thus apparent that there are in fact two periods of time provided by the *habendum* clause in such leases; the definite fixed term for exploration and discovery which vests immediately upon the execution of the lease and terminates in the absence of earlier forfeiture at the expiration of the definite fixed term, *and secondly, the indefinite period for production which likewise vests immediately upon the execution of the lease and continues until oil or gas is no longer produced.*" (Italics added.)

In *Caswell* v. *Gardner*, 12 Cal.App.2d 597 [55 P.2d 1222], the lease specified a term of years, and further provided for its termination in the event oil was not produced in paying quantities within one year from the date of execution, or if the lessee failed to commence drilling within a specified time. The principle is stated at page 600:

"That the parties to a lease may agree upon a contingency that will bring a lease to an end before the expiration of the full term thereof is beyond question. It is what is commonly known as a conditional limitation, and it is such termination and limitation we are here considering. Respondent seems to contend that we are here dealing with a forfeiture and

that the rules applicable thereto should be invoked, but in that he *is in error.*"

In the *Caswell* case, several notices of default and written demands to cure failures to comply with covenants in the lease had been given; these provisions are not quoted in the opinion, but the lease obviously provided for forfeiture requiring notice in the event of breach of contractual obligations. The court did not carry the notice requirements over to the *habendum* clause, however, and held that the term of the lease was defined and limited by virtue thereof.

*Macco Construction Co.* v. *Fickert,* 76 Cal.App.2d 295, 304 [172 P.2d 951], held that when the primary term of the lease expired without the existence of certain facts specified as prerequisites to an extension thereof, the rights of the lessees ceased without the necessity of notice.

"A forfeiture is not involved where an oil lease provides that the premises must be producing oil or gas in paying quantities at the expiration of the term specified. Such a provision is a conditional limitation."

The Supreme Court again recognized the existence of the determinable fee in California in *Henck* v. *Lake Hemet Water Company,* 9 Cal.2d 136, 140 [69 P.2d 849], and distinguished it from a fee on condition subsequent:

"The difference is a distinct one, and in the case of a determinable fee which terminates upon the happening of the contingency the estate is at an end without any further act on the part of the defendant; while in the case of a vested estate subject to defeasance upon condition broken—a condition subsequent—the defendant, upon the happening of the contingency, is entitled only to the right to terminate the estate, or a right of reentry. [Citations.]"

In *Renner* v. *Huntington-Hawthorne Oil & Gas Co.,* 39 Cal. 2d 93, 96 [244 P.2d 985], the *habendum* clause specified that the term of the lease was 20 years, ". . . 'and so long thereafter as oil or gas or other hydrocarbon substances can be secured therefrom in paying quantities within the definition hereinafter particularly specified, unless otherwise surrendered or forfeited by the Lessee.' " " 'Oil in paying quantities,' " the lease provided, " 'shall be understood to mean a well drilled from which there may be pumped for a period of thirty (30) consecutive days a quantity of oil which shall average fifty (50) barrels of oil . . . per day.' " When the 20 years expired, oil was not being produced in "paying quantities" as defined in the instrument. Lessee's successor nevertheless

continued operation of the well, and the lessor and his successor received royalties regularly, month by month, for another six years. The owner then prevailed in a quiet title suit. At page 98 of the opinion, the Supreme Court said:

"Plaintiff contends and the trial court took the view that the lease means just what it plainly says. This construction of the lease is more tenable than the rather strained construction, hereinafter discussed, which is urged by defendants. The oil lease, with its 'and so long thereafter' phrase in the *habendum* clause, created a determinable fee interest in a *profit á prendre*. [Citations.] . . . *A determinable fee terminates upon the happening of the event named in the terms of the instrument which created the estate; no notice is required for, and no forfeiture results from, such termination.* [Citations.]" (Italics added.)

In the *Renner* case the lessee had spent large sums, after expiration of the primary term, in cleaning out wells, replacing and installing new equipment and in pumping. Special defenses urged were: that there had been no complaints relative to continued operation for over 21 years; laches; estoppel; continued acceptance of royalties; extensive expenditures by the lessee and continuous operation; and that the definition of "oil in paying quantities" applied to the drilling clause only and not to the *habendum*. The Supreme Court simply held that the quantity of oil required by the *habendum* clause had not been produced and that the term of the lease had therefore ended by its own provisions. The *ratio decidendi* may be summarized as follows: (a) The "thereafter" provision of the *habendum* clause created a determinable fee interest in a *profit á prendre*; (b) termination of the term of the lease occurred automatically on the happening of the stated event; (c) no forfeiture resulted and no forfeiture was required; (d) the phrase "in paying quantities" differs with the context in which it is used; in the *habendum* clause it means mutually profitable for both the lessor and the lessee, but in the drilling clauses it is for the benefit of the lessee to protect the lessee from the burden of drilling a well which would not pay out; (e) no estoppel resulted from acceptance of royalties by the lessor after the termination of the lease; (f) as there was a continuity of possession by the lessee during and after the primary term and a regular monthly payment of rental which was regularly accepted, a month-to-month tenancy was created entirely apart from the lease.

*Richfield Oil Corp.* v. *Bloomfield,* 103 Cal.App.2d 589, 590

[229 P.2d 838], dealt with an "unless" type of oil lease: "If operations for the drilling of a well for oil or gas be not commenced on said land on or before one year from this date, this lease shall terminate as to both parties, unless the Lessee shall, on or before one year from this date, pay or tender to the Lessor . . ." a specified sum of money.

Paragraph 18 in that lease provided: "Upon the violation of any of the terms or conditions of this lease by the lessee and the failure to remedy the same within sixty days after written notice from the lessor so to do, then at the option of the lessor this lease shall forthwith cease and terminate."

The lessee had not commenced drilling or paid the required money; the lessor had not given notice of default. The appellate court said, at page 591:

"From the nature of the 'unless' type of lease, it carries within its own phraseology an automatic termination which clicks when the lessee fails to commence drilling operations within the time specified and also fails to exercise his privilege of paying delay rentals in advance. [Citations.]

"This is the rule even though the lease has a provision requiring notice of default to be given the lessee upon his breach of any term in the agreement. In the recent case of *Alexander* v. *Oates*, 100 Cal.App.2d 266 [233 P.2d 264] where the lease provisions were similar to those involved herein, it was pointed out that the covenant requiring written notice of default applied only to the lessee's failure to perform other conditions in the lease and that such notice clause was not inconsistent with a provision for automatic termination, citing *Carlisle* v. *Lady*, 109 Cal.App. 567 [293 P. 686]. In the latter decision a similar notice clause was held to refer to covenants to be performed by the lessee and not to a provision that drilling was to be commenced within a set period under penalty of termination. [Citations.]

"It should be observed that this rule of automatic termination is correct not only as a matter of proper and reasonable interpretation of the lease agreements but is based on sound considerations of policy as well. The duty to drill and explore the property, where no substantial cash consideration is involved, should be treated not as a mere covenant but as a condition to the lease's continued existence for the reason that practically the entire consideration depends on the undertaking. Certainly, the lessee should not be assisted and encouraged to hold the lease for speculative purposes only with-

out making any attempt to develop the property's possible resources."

The opinion in the *Richfield Oil Corp.* case, *supra,* is cited and quoted from with approval in *Fremont Lumber Co.* v. *Starrell Petroleum Co.,* 228 Ore. 180 [364 P.2d 773], a well-considered case of first impression in Oregon, where the argument was made that a covenant requiring notice for breach of any obligation arising under the lease, controlled the *habendum* clause which provided for a primary term of five years "and as long thereafter as oil, gas or other mineral is produced from said land or lands with which said land is pooled." After a discussion of the nature of oil leases and the proper construction of phrases employed in such documents, the court said at page 777 [364 P.2d]:

"Paragraph 9 [notice provision] does not change the lease from one on a special limitation to one on a condition subsequent. Paragraph 9 speaks of obligations and breaches thereof. But when the 'unless' clause is found in a lease the lessee does not covenant to drill or pay. [Citation.] Since there is no covenant in the lessee to *drill or pay rent* or conduct operations, and such payments and activities are optional, the breaches referred to in paragraphs 9 and 13(b) are limited to such covenants and obligations as may be found elsewhere, such as the promises to pay certain royalties when oil or minerals are produced, . . . or to repair fences and bury pipe lines, . . . or to repair fences and fill holes. . . ."

The court was impressed with the wisdom behind the theory of automatic termination as expressed in the *Richfield Oil Corp.* case, *supra,* 103 Cal.App.2d 589, and it quotes from 2 Summers Oil and Gas (perm. ed.) page 202, as follows:

"*Thereafter* refers to the end of the definite term. But what must the lessee do before the end of the definite term to extend the lease beyond the term and keep it alive? If the state of fact necessary for the continuance of the life of the lease is production in some quantity, it seems that the only logical deduction as to the act required of the lessee for the extension of the lease beyond the definite terms is that he be engaged in production of oil or gas from the land, in some quantity, before and at the end of the definite term. If he is not so acting at that time, the lease ends by its own terms, and certainly has no basis for renewed life, if production is accomplished a day or a year later. . . ."

Additional California cases in which the contention is rejected that a notice requirement relating to the contractual

obligations of the lessee converts the interest created by an oil lease from a determinable estate upon a special limitation to an estate on a condition subsequent are: *Norris Oil Co.* v. *von Glahn,* 104 Cal.App.2d 159 [230 P.2d 885]; *Alexander* v. *Oates,* 100 Cal.App.2d 266 [223 P.2d 264] (where the notice requirement was contained in a paragraph numbered 21 identical with paragraph 21 in this case); and *Carlisle* v. *Lady,* 109 Cal.App. 567, 573 [293 P. 686].

In *Stetson* v. *Orland Oil Syndicate, Ltd.,* 42 Cal.App.2d 139 [108 P.2d 463], the lease provided for its termination if a well was not commenced before a specified date unless commencement was deferred by a payment of an amount giving the lessee an additional one-year term, and also contained a clause requiring a notice of forfeiture to remedy breach. At page 142 of the opinion the court said:

"Appellants further urge on this appeal that they were entitled to ninety days' notice of termination and a specification of the grounds claimed therefor in order that opportunity might be afforded to remedy any breach. From the statement of the case as made it is obvious that such a contention is without merit. In the first place, the lease imposed no obligation upon lessees to commence a well. Appellants had the option as to whether they would or would not commence a well and they had the right to defer any commencement until the last day of the lease. Therefore, there could have been no ninety-day period within which such a notice could have been given. No forfeiture of the lease is claimed by respondents. They stand squarely upon the fact that the lease has terminated by its own terms. Surely a forfeiture notice of breach of conditions would not be required to advise appellants that the term had ended. If the term ends there is nothing that appellants could do to remedy that situation."

In *Valer Oil Co.* v. *Souza,* 182 Cal.App.2d 790, 798 [6 Cal. Rptr. 301], the court said: "The lease with the 'and so long thereafter' phrase in the habendum clauses created a determinable fee interest in a *profit à prendre.* A determinable fee terminates upon the happening of the event named in the terms of the instrument which created the estate; no notice is required for, and no forfeiture results from, such termination."

And at page 801 it is said: "The notice requirement could have no application to conditions [or] covenants that could not be performed after the notice."

The appellant contends that the *habendum* clause must be

read with section 21 of the lease on the principle that a document should be considered as a whole and that every part of a writing should be weighed with every other part to determine the exact meaning and effect of the document; that considering the provisions of paragraph 21 with the *habendum* clause the lease in reality provides for a condition subsequent requiring notice; that there is insufficient evidence in the record upon which to base a finding that the lessee and those representing her did not produce oil in paying quantities, but that if there was in fact a failure to produce in paying quantities, a notice of termination would have to be given. Appellant further argues that the *Renner* case and other cases heretofore cited hold only that the production of oil in paying quantities is a condition precedent to the initiation of an interest in the ''thereafter'' period and do not control the secondary term.

Appellant also calls attention to the statement in *Mc-Dougall* v. *Palo Alto Unified School Dist.*, 212 Cal.App.2d 422 [28 Cal.Rptr. 37], that constructional preference is for a fee simple on condition subsequent rather than on a fee simple determinable. The *McDougall* case, however, was not an oil case but involved a deed of a lot for a school house site which provided that whenever the grantee abandoned the premises or failed to use them for the specified purpose the land would revert to the grantor. There are noted differences between the rules of construction of oil and gas leases and the construction of deeds and leases which do not involve the production of oil. (2 Summers Oil and Gas (perm. ed.) Construction in Favor of the Lessor, § 372, pp. 485-502.)

Weighing the authorities on the subject, we reach the same conclusion as the trial court with respect to the meaning and effect of the *habendum* clause. We recognize that the question is one of law and that as there was no extrinsic evidence in aid of the construction of the instrument, this court may reach a conclusion independently of that arrived at by the trial court. (*Transport Oil Co.* v. *Exeter Oil Co.*, 84 Cal.App.2d 616, 620 [191 P.2d 129].) It is our holding that the *habendum* clause created an estate determinable upon a special limitation applicable both to the primary and the ''thereafter'' term and that the notice requirement contained in paragraph 21 relates to the covenants numbered 1 to 30 and does not operate to change the interest of the defendant to an estate on condition subsequent.

We next inquire whether the stated event occurred: was there proof of failure to produce in paying quantities and

if so, when did such failure occur? Our conclusion again co-incides with that of the trial court, which observed in its memorandum opinion: ''Failure to produce at all is certainly failure to produce in paying quantities. The periods of non-production are of sufficient length to put the matter outside the rule of *de minimis*. If legal or equitable grounds existed to excuse the failure to produce, the burden was upon Powell to bring them forward. She has not carried this burden. I therefore conclude that the lease terminated, if not in April 1948, then certainly in August of 1949.''

In *Ware* v. *Stafford*, 148 Cal.App.2d 840, 844 [307 P.2d 950], it is said: ''Production meant production as that term is used in oil-field practice which is paying or commercial production. The purpose of an oil and gas lease is to recover and save those hydrocarbon substances from the ground leased in such amounts as would pay royalties to the lessor and make profits for the lessee.''

The complete cessation of production ended the term of the lease. Appellant argues that there was no proof that oil was not produced in paying quantities at the time of the filing of the lawsuit, or during the periods of actual production, or during the total time elapsing between the execution of the lease and the filing of suit. In this connection, appellant points out that if production is averaged over the full period, plaintiff received a total of $6,717, which is over $500 per year, and the defendant, ''. . . through her sublessees, would have had an income of over $53,000''; it is further claimed the lessee has the right to decide what is and what is not a profitable operation; that profitable operation does not mean that the cost of development must be returned, but that it means only ''production in quantities sufficient to yield a return in excess of operating costs, even though drilling and equipment costs may never be repaid and the undertaking considered as a whole may ultimately result in a loss.'' (*Renner* v. *Huntington-Hawthorne Oil & Gas Co., supra*, 39 Cal.2d 93, 99.) ▪ The gist of all of defendant's arguments with respect to this point is that the operation as a whole should be looked to in order to determine whether the totality of the operations resulted in a loss. We cannot agree with the contention of appellant that total cessations of production for the long periods of time shown by the evidence should be overlooked or averaged down.

Appellant argues also that so long as there was oil in the ground which, if pumped, would comply with the require-

ment that oil be produced in paying quantities, the cessation of pumping would not terminate the lease. But the purpose of an oil lease is to produce the natural hydrocarbon products that are underground, and if a lessee could say that compliance with a provision requiring the production of oil in paying quantities is effected by merely showing that the oil is in the ground and could have been produced if the lessee had acted to produce it, he would thereby be excusing his own default without penalty to the utter confusion of common sense.

We hold that the words mean exactly what they say and that a total cessation of production by the lessee such as occurred in this case effectively terminated the rights of the lessee under the "thereafter" provision of the *habendum* clause.

On December 15, 1951, appellant executed a document in favor of R. Monterastelli denominated an assignment but which counsel for appellant claim was actually in legal effect a sublease. From the period of the execution of that document until a few months prior to the commencement of the quiet title action the appellant did not personally carry on oil-producing operations. Monterastelli in turn assigned or subleased to one Brown, and later other persons, including Pilgrim and McSween and Associates and Cal-Kern Associates, actually carried on whatever was done in the field, claiming a right to do so by reason of documents executed in turn by their immediate predecessors. ▇ The Monterastelli instrument recites that the lease between Montana-Fresno Oil Company and L. Jean Marvin (Powell) is in existence and that she desires to assign it to him; it provides in part:

"Subject to the conditions hereinafter contained, Assignor does hereby grant, sell, convey, transfer, assign and set over unto Assignee, his successors and assigns, that certain Oil and Gas Lease dated July 16, 1945, executed by Montana-Fresno Oil Company, a corporation, as Lessor, and L. Jean Marvin [Powell], Lessee, and the said Assignor does hereby reserve unto herself an overriding royalty of 4-1/6% of all oil, gas, casing head gasoline, and other hydrocarbon substances saved and sold from the land described in said Oil and Gas Lease pursuant to the provisions of said Oil and Gas Lease."

The "assignee" covenants to perform all of the lessee's agreements under the Montana-Fresno Oil Company lease, contracts to pay a minimum royalty of $200 per month to her for a period of one year from December 20, 1951, and a

royalty of at least $300 per month so long thereafter as assignee has possession of the premises. *Hartman Ranch Co. v. Associated Oil*, 10 Cal.2d 232, 243 [73 P.2d 1163] and similar holdings in *Garner v. Knudsen*, 129 Cal.App.2d 747, 754-756 [277 P.2d 890], and *Backus v. Duffy*, 103 Cal.App. 775 [284 P. 954], furnish the basis for a conclusion that the document is in form really a sublease rather than an assignment. But as the term of the lease between appellant and respondent had already ended, there was nothing either to sublease or to assign.

The same observation effectively disposes of the special defenses of laches, estoppel, waiver and unjust enrichment, which are not very painstakingly pleaded in the amended answer. The trial court specifically found that there was no evidence effectively supporting any of the foregoing defenses; in this connection, it must be borne in mind that this is a quiet title suit and that no question of damages is pleaded or involved. If the term of the lease previously ended by reason of failure to produce oil in paying quantities, nothing that occurred after that time would cancel the termination or initiate a new lease. (*Caswell v. Gardner, supra*, 12 Cal.App.2d 597; *Renner v. Huntington-Hawthorne Oil & Gas Co., supra*, 39 Cal.2d 93, 100-101; Code Civ. Proc., § 1971; *Stetson v. Orland Oil Syndicate, Ltd., supra*, 42 Cal. App.2d 139, 142-143; *Gas Ridge, Inc. v. Suburban Agricultural Properties*, 150 F.2d 363, 365.)

 With respect to laches, it is said in 3 Williams, Oil & Gas Law (1962) section 604.7, page 82: "Since termination of a lease by operation of the limitation provision of the *habendum* clause is automatic, the lessor's delay in bringing suit appears immaterial."

 Waiver cannot create a lease or any legal estate. On termination of the lease plaintiff could not have compelled Powell, or anyone after her, to produce or develop under the lease. Since there was nothing plaintiff could compel, there was nothing to waive. As is said in 3 Williams, Oil & Gas Law, section 604.7, page 82:

"Any defense that the lessor has waived his right to assert termination of the lease would seem inapplicable." (See also *McDougall v. Palo Alto Unified School Dist., supra*, 212 Cal.App.2d 422; *Woodruff v. Brady*, 181 Okla. 105 [72 P.2d 709, 113 A.L.R. 391].)

Volume 3 Williams, Oil & Gas Law, section 604.7, page 79, says with regard to estoppel: "Once an event has oc-

curred which under the usual rule calls for the termination of the lease, subsequent action or inaction of the lessor will ordinarily not estop him from asserting the termination."

Appellant makes much of the fact that royalties were accepted by the respondent long after the date when it now contends that the lease terminated. It is clear that this would not constitute an estoppel. (See *Renner* v. *Huntington-Hawthorne Oil & Gas Co., supra,* 39 Cal.2d 93, 100-101; *Watson* v. *Rochmill,* 137 Tex. 565 [155 S.W.2d 783, 137 A.L.R. 1032]; *Victory Oil Co.* v. *Hancock Oil Co.,* 125 Cal.App.2d 222, 235 [270 P.2d 604].)

Correspondence was carried on between the parties in which the underlying assumption seems to have been that the lease continued to have some validity, and conferences were held at various times looking toward a continuation or resumption of the relationship of the lessor and lessee. All of these communications are subject to the fatal objection already noted; as the term of the lease had already ended, these meetings and this correspondence could not breathe life into something which was dead.

Two contentions of appellant remain to be considered: (1) it is argued that even if the term of the lease ended there came into existence a month-to-month tenancy, which is still in effect because no notice of termination was given; the case of *Renner* v. *Huntington-Hawthorne Oil & Gas Co., supra,* 39 Cal.2d 93, 102, is relied upon. But the *Renner* case is factually distinguishable from the present suit; in that case there was a regular monthly payment of royalty, but here the payments were irregular with long intervening gaps, so that they could not fairly be called monthly payments; and in the *Renner* case the lessee was always personally in possession, and it operated the single well involved, while here the appellant, except by physical seizure of the land after the actual operator had left, was not actively in the position of a lessee; here there are judgments in favor of plaintiff by default or otherwise against everyone involved except the appellant, and she never, by concession of all of the others involved or by any legal proceeding, had recovered possession of the land from Monterastelli or the other persons succeeding him who had actually operated the oil wells.

In its memorandum opinion the trial court said: "In the instant case, Powell assigned to Monterastelli in 1951, reserving only a 4-1/6% 'override.' He, in turn, assigned to Brown in 1953. From there, the 'interests' spread like weeds. Brown

has disclaimed. Neither Brown nor Monterastelli have re-assigned or quitclaimed to Powell. Monterastelli asserts an interest. Several of the so-called 'operators' were strangers to the title. Powell's notice of default to Monterastelli (if such it was) did not act automatically to re-vest his interest in her. It was merely a preliminary step to a legal proceeding to cancel his claimed interest. Such a legal proceeding was never taken and the court in this case could not, under the pleadings, attempt to determine the respective interests of the defendants as between themselves. The evidence in the case is such that I cannot say that Powell retained any interest in the leased property other than an 'override.' To hold that she is a tenant from month to month and therefore entitled to 'possession' of the property until notice to surrender is to decide the rights of all defendants as between themselves.''

It would be an unjustifiable conclusion on our part to hold, contrary to the findings of the trial court, that a month-to-month tenancy was created.

■■■ The claim that the plaintiff is entitled to certain land surrounding wells on the property by virtue of the provisions of paragraph 21 of the lease is without merit. As the term of the lease had ended, all derivative interests and claims of every kind by any of the defendants based on the lease were extinguished for that very reason.

The judgment is affirmed.

Stone, J., concurred.

A petition for a rehearing was denied September 20, 1963, and appellant's petition for a hearing by the Supreme Court was denied October 23, 1963.